JACOB S. WISE, PLAINTIFF IN ERROR, v. DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY, DEFENDANT IN ERROR.

Submitted December 5, 1910—Decided June 22, 1911.

In an action against a railroad company to recover damages sustained by plaintiff who, while driving a horse and wagon upon a public highway, was struck by a locomotive engine at a grade crossing, it was *held*—

(1) Evidence that the defendant's locomotive engine was not running on schedule time, was being driven backwards, and omitted to give the statutory signal of its approach to the crossing, clearly made out a *prima facie* case of negligence on the part of defendant.

(2) The law requires a traveler upon a highway, on approaching a railroad crossing, to exercise the care that an ordinarily prudent man would exercise in the presence of such dangers as he had reason to apprehend.

(3) A traveler upon the highway under ordinary circumstances is not required, as matter of law, to bring his horse to a stop in close proximity to the railroad track; whether in the exercise of due care he ought to stop his horse or to reduce its speed is usually a question for the jury.

(4) It has not been held in this state that it is the duty of a traveler to stop his horse upon approaching a railroad crossing, except in cases where there are transient noises, or temporary obstructions to the view.

(5) The law does not require a traveler to insure his own safety against dangers arising from the negligent operation of railroad trains; it only requires that he shall exercise reasonable care for his safety, and when the view is in part obstructed, and the traveler is required to select a place for making an observation, the law only requires that he shall exercise reasonable care about the selection of the place.

(6) A traveler driving his horse upon the highway, approached a single track railroad crossing, with his view obstructed in both directions, having reason to believe, from observations already made in one direction, that no train was coming from that side, and having reason to expect a scheduled train from the other direction. *Held*, that he was not indisputably guilty of contributory negligence if, at the earliest opportunity after passing the obstructions, he first made an attentive observation in the direction of the apprehended danger, even though he was thereby prevented from looking as carefully as otherwise he might for trains from the other direction.

On error to the Supreme Court.

For the plaintiff in error, *Allen R. Shay.*

For the defendant in error, *Max M. Stallman.*

The opinion of the court was delivered by

PITNEY, CHANCELLOR. This action was brought to recover damages sustained by the plaintiff, in the way of injuries to his person and the destruction of his horse and wagon, occasioned by a collision with a locomotive engine operated by the defendant company, at a highway crossing known as Strader's crossing, in the county of Sussex. According to the evidence introduced by the plaintiff, the locomotive engine was not running on schedule time, was being driven backwards, and omitted to give the statutory signal of its approach to the crossing. This clearly made a *prima facie* case of negligence on the part of defendant.

The trial judge nonsuited the plaintiff on the ground of his contributory negligence, and the judgment thereon entered is now under review.

The occurrence took place between ten-thirty and eleven o'clock on a winter's morning. Plaintiff was driving a single horse attached to a light buggy, with top raised and side curtains in place. The road upon which he was traveling leads in a northeasterly direction from Newton to the borough of Sussex, and crosses at about right angles the single-track railroad of defendant between Lafayette (which lies to the southeast) and Augusta (to the northwest). The highway enters a cut at a point distant approximately one hundred and eighty-five feet southwesterly from the railroad, and from this point until the traveler reaches a point about fifty feet from the track, the banks that form the sides of the cut prevent a view being had of the railroad in either direction, except at one place, not definitely located by the evidence, where there is an opening in the bank on the left. The road through the cut is narrow (about twenty-five feet) and its grade descends towards the crossing. At a point about fifty-five feet from the centre of the track the bank on the left falls away, but between this point

and the crossing the view of the railroad on that side was at the time in question further obstructed by a heap of ties that stood near the crossing, and perhaps to some extent interfered with by certain other heaps of ties that stood near the southwesterly side of the track, beginning at a point near the crossing and extending along the railroad for several hundred feet. According to the evidence the approaching traveler, on emerging from the cut, first had a clear view of the tracks to the left when he was at a point twenty-six feet from the centre of the track. On the right side of the road the embankment fell away and opened up the view to the approaching traveler at a point about forty-three feet from the centre of the track. In giving effect to these distances of twenty-six feet and forty-three feet, respectively, it is of course obvious that proper allowance must be made for the half of the width of the track, for the overhang of the locomotive engine beyond the rail, and for the distance from the driver's position to the horse's head (this latter, according to the evidence, was between twelve and fourteen feet), all of which tended to limit the space and reduce the time within which one driving along the highway must make such observation as he might after passing the obstructions and before his horse should come within reach of an approaching train.

Plaintiff had frequently traveled that way, and was quite familiar with the crossing and its immediate surroundings. It does not appear that before the accident he had precise and certain knowledge of the distances just referred to; these measurements were the result of a survey made afterwards. Plaintiff knew, however, that the crossing was a dangerous one. He also knew, or at least had reason to believe, that a train from the southeast was about due at the time. He had no special reason for anticipating the coming of a train from the other direction—that is, from the left, the direction of Augusta.

As he approached the crossing he had, according to his testimony, no opportunity for a view of the railroad in the direction of Lafayette before the highway entered the cut above mentioned. But at a point estimated by him as being about

two hundred and fifty feet from the crossing he had an extensive view of the railroad toward Augusta, and he there checked his horse for a moment, and looking in that direction he saw no train, although as he believed he could see the railroad for a distance of three-quarters of a mile to a mile. He testified that in this he was deceived; that from subsequent observations he learned that certain bushy willow trees that stood near to the southwesterly side of the railroad at a distance (according to the surveyor's measurement) of one thousand one hundred and fifty-seven feet northwesterly from the crossing, interfered with the view of the railroad beyond. Seeing no train, he proceeded on his way, looking again to the left as he passed the gap in the embankment, and, still seeing nothing, he went forward to the crossing, his horse ambling at the rate of about seven miles per hour.

From the plaintiff's testimony and from all the circumstances the jury might fairly infer that when he reached the immediate vicinity of the crossing he was satisfied—and reasonably so—from the observation previously made of the railroad in the direction of Augusta, that no train was coming from that side; that having as yet had no opportunity to look out for a train on the right, and having reason to expect a scheduled train from that direction, he concluded, and reasonably concluded, that it was most important for him to observe the track to the right at the first opportunity; that immediately upon emerging from the cut he attentively looked to the right and listened for a train, and that for this reason he failed to see, as soon as otherwise he might have seen, the engine that was in fact coming from the left. He testified that he neither saw nor heard any train until he observed the locomotive coming upon him from the left at a distance of fifty or sixty feet. The engine struck the horse; the plaintiff was not struck, but was thrown from the wagon and seriously injured.

Two things, not as yet mentioned, may have had a tendency to further complicate the situation. The railroad as it comes from the direction of Lafayette has a slight curve, and it passes through a rock cut which terminates about two hundred and fifty feet from the crossing.

A reasonable explanation of the occurrence, as it seems to us, is that when the plaintiff arrived at this dangerous crossing without knowledge as to the situation on his right, but with his mind impressed with the idea that a train was due from that direction, and at the same time resting under the impression, gained from his own observation, that no train was coming from the left (indeed, as it was a single-track railroad, the probability of a train coming from the right tended to negative the probability of a train coming from the opposite direction), emerging, as he did, from the narrow cut and having his view opened to the right a little sooner than a clear view could be had to the left, the plaintiff naturally looked to the right side first; that as his view widened, and as his vision extended further and further along the track, he gazed in that direction —towards what he calls the "danger point"—so fixedly and attentively that he consumed the brief space of time available. In short, before he had finished his observation to the right, and while he was still looking in that direction, the horse had got so near to the track that when plaintiff's attention was directed to the oncoming engine it was too late to stop the horse.

Does a collision occurring under such circumstances import negligence on the part of the traveler so clearly that reasonable and fair-minded jurymen may not differ about it? We think not, by any means.

The space was very narrow and the time very brief. According to the surveyor's measurement the embankment falls away on the right at a point forty-three feet from the centre of the track. Reducing this by one-half the width of the track, *plus* the overhang of the locomotive, *plus* the distance from the driver to the horse's head, leaves probably twenty-five feet or a little more to be traversed. But this must be still further reduced, first, because the traveler does not realize that he has a clear view, and does not begin to avail himself of the benefit of it, until he has proceeded some little distance beyond the obstruction; and secondly, some considerable space is required in which to check the momentum of the horse. With a horse going at the rate of seven miles per hour, or approximately

ten feet per second, the whole time available for the plaintiff's observation was but a very few seconds—perhaps two seconds at the utmost. The law required him to exercise the care that an ordinarily prudent man would exercise in the presence of such dangers as he had reason to apprehend. It required him to look, and look with real and careful attention, for trains. Such an observation is not as instantaneous as a mere passing glance; it requires some appreciable space of time. The curve in the track, and the rock cut, already referred to, to some extent, although, perhaps, only slightly, increased the difficulty of making a satisfactory observation of the track in that direction, and therefore prolonged to some extent the time consumed. The law requires that the traveler shall look both ways for trains if there be opportunity to do so; but it does not require that he look both ways at once. *Winter v. New York and Long Branch Railroad Co.*, 37 *Vroom* 677, 679. Nor is it necessarily required, as matter of law, under ordinary circumstances, that a man shall bring his horse to a stop in close proximity to the railroad track—a method of procedure that is fraught with dangers of its own. So, likewise, whether the plaintiff ought to have reduced the speed of his horse below seven miles an hour, was, as we think, a question for the jury and not for the court. Reducing the speed would have increased the time available for looking out for trains; but at the same time it would have prolonged the time of crossing and thereby increased the chance of collision.

The law does not require a traveler to insure his own safety against dangers arising from the negligent operation of railroad trains. It only requires that he shall exercise care for his safety. And when it becomes a question of selecting the proper place for making an observation where the view is in part obstructed, the law only requires the traveler to exercise reasonable care about the selection of the place. *Conkling v. Erie Railroad Co.*, 34 *Vroom* 338, 342; *Higgins v. Public Service Railway Co.*, 50 *Id.* 471.

The trial judge based his action in granting the nonsuit upon the ground that according to the undisputed testimony there was at a point twenty-six feet from the railroad crossing

an unobstructed view of the railroad in the direction from which the train came; that this space of twenty-six feet constituted a zone of safety where plaintiff could have seen the approach of the train; that the law required him to make his observation at this place, and, if necessary, to stop. In this the judge, as we think, clearly erred; perhaps because he overlooked or gave too little force to the circumstance that the plaintiff's view was obstructed in both directions, that there was (as the jury might fairly infer) a reasonable ground for the plaintiff to believe that there was more danger of a train from the right than from the left, and that he already had reasonable ground to believe that he was safe so far as trains from the left were concerned. The learned judge erred also in laying down the rule with respect to the supposed duty of the plaintiff to stop his horse. That duty has not been held, in this state, to arise except where there are transient noises or temporary obstructions to the view. *Merkle* v. *New York, Lake Erie, &c., Railroad Co.,* 20 *Vroom* 473; *Central Railroad Co.* v. *Smalley,* 32 *Id.* 277, 279; *Keyley* v. *Central Railroad Co.,* 35 *Id.* 355.

The cases to which we are referred as supporting the decision of the learned judge are *Pennsylvania Railroad Co.* v. *Righter,* 13 *Vroom* 180; *Pennsylvania Railroad Co.* v. *Leary,* 27 *Id.* 705; *Winter* v. *Railroad Company,* 37 *Id.* 677, and *VanRiper* v. *Railroad Company,* 42 *Id.* 345. In our judgment, none of these furnishes a sufficient authority for taking the present case from the jury.

In the Righter case it was held by this court that plaintiff's servant was clearly guilty of contributory negligence in failing to observe a train that was in plain sight as he approached the crossing, his field of vision being clear while he was still more than thirty feet from the middle of the track upon which the train was coming. But the circumstances of that case were quite different from those now presented. Fairmount avenue, upon which Righter's wagon was being driven, was eighty feet in width and about level, crossing the railroad at right angles; there were three tracks, and the view in both directions was wide open saving for a few trees on the right-hand side, which

was the side from which it happened that the train was coming. In the other direction (as is particularly mentioned in the opinion) there were "neither fences, houses nor trees to intercept the vision;" therefore Righter's servant had ample opportunity to first completely safeguard himself· and his fellow passengers from danger of any train coming from the left, and was then at liberty to devote his entire attention to looking out for dangers from the right; and on the right there were only a few trees to intercept his view, and, after passing these, he had a clear space of over thirty feet before reaching the track upon which the train was approaching. It is true that the first track to be crossed was much nearer, but of this track and its· probable freedom from danger he was already advised.

In *Pennsylvania Railroad Co.* v. *Leary,* 27 *Vroom* 705, the plaintiff had been driving for a half mile or more along a turnpike road that ran nearly parallel to and a short distance from the railroad. When within fifteen or twenty yards of where the road turned and crossed the railroad he merely turned his head, and "knowing that it was not train time," looked in the direction from which a train was in fact approaching. The opinion mentions that "there was nothing to distract his attention, and he had ample opportunity to view the road for over half a mile and see the approaching train, and avoid the danger." It is quite plain that this case has nothing in common with the present.

In *Winter* v. *New York and Long Branch Railroad Co.,* 37 *Vroom* 677, plaintiff contented himself with listening and looking only once toward a quarter from which a train might approach, and then when at a distance of about three hundred and sixty-eight feet from the crossing. He was struck by a train that he would readily have seen had he not confined his attention to looking in the other direction while going this entire distance of over three hundred feet.

In *VanRiper* v. *New York, Susquehanna and Western Railroad Co.,* 42 *Vroom* 345 (a Supreme Court decision), the plaintiff's view of the track upon which the train that struck him was approaching was somewhat obscured by a row of trees

that stood about forty-five feet from the first rail of that track, and as the plaintiff drew near to the crossing his view was obstructed to some extent by telegraph poles; but upon reaching a point thirty-two feet from the first rail of the track he had an unobstructed view, which continued to be uninterrupted until the crossing was reached. So far as the report shows, there was no obstruction to the view of the plaintiff in the other direction. We are not called upon to either approve or disapprove of the decision (which was to set aside a verdict on the ground of plaintiff's contributory negligence), but will content ourselves with saying that the case is not at all parallel to the one we have before us.

It seems to us that where a traveler, driving his horse upon the highway, approaches a single-track railroad crossing, as the present plaintiff did, with his view obstructed in both directions, with reason to believe from observations already made in one direction that no train is coming from that side, and with reason to expect a scheduled train from the other direction, he is not indisputably guilty of contributory negligence if at earliest opportunity after passing the obstructions he first makes an attentive observation in the direction of the apprehended danger, even though he is thereby prevented to some extent from looking as carefully as otherwise he might for trains from the other direction. We do not mean to intimate that plaintiff's knowledge or supposed knowledge of the train schedule, or the observation he had made of the track towards Augusta before he entered the cut, warranted his omitting any precaution that an ordinarily careful man would employ after emerging from the cut and coming to the immediate neighborhood of the crossing. But when the evidence shows (or so the jury might find) that he employed every moment after passing the obstructions in looking and listening for danger upon the rail, it cannot be said as matter of law that he was guilty of contributory negligence because he looked in one direction rather than the other, when it may well be that he had not time to properly examine the track in both directions. The question whether he was negligent should have been submitted to the jury.

. The judgment under review will be reversed, and a *venire de novo* awarded.

*For affirmance*—THE CHIEF JUSTICE, BERGEN, MINTURN, SULLIVAN, JJ.  4.

*For reversal*—THE CHANCELLOR, GARRISON, SWAYZE, PARKER, VOORHEES, KALISCH, BOGERT, VREDENBURGH, CONGDON, JJ.  9.